UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SHAWN HODGES,

                      Plaintiff,               Civil Action No. 14-11837
                                             Honorable John Corbett O'Meara
v.                                     Magistrate Judge David R. Grand

CORIZON, CORIZON OF MICHIGAN,
PRISON HEALTH SERVICES, INC.,
HARRIET A. SQUIER, M.D., ASTER
BERHANE, M.D., JOSHUA A.
BUSKIRK, P.A., DANIEL A. HEYNS,
and GEORGE PRAMSTALLER,

                      Defendants.
_____/

## REPORT AND RECOMMENDATION TO GRANT IN PART AND DENY IN PART THE CORIZON DEFENDANTS' "MOTION TO DISMISS PORTIONS OF PLAINTIFF'S AMENDED COMPLAINT"[1] [14]

Before the Court is a Motion to Dismiss filed on June 16, 2014, by certain of the defendants to this action – Defendants Corizon, Inc., Corizon of Michigan, Harriet Squier, M.D., Joshua Buskirk, P.A., and Aster Berhane, M.D. (collectively the "Corizon Defendants").[2] (Doc. #14). Plaintiff Shawn Hodges ("Hodges"), an incarcerated person who is represented by counsel, submitted a response to this motion on August 1, 2014 (Doc. #22), and the Corizon Defendants filed a reply on August 7, 2014 (Doc. #24). An Order of Reference was entered on May 8, 2014, referring all pretrial matters to the undersigned pursuant to 28 U.S.C. §636(b). (Doc. #3).

---

[1] The Court notes that no amended complaint has been filed in this action, and the moving defendants are asking the Court to "dismiss the entirety of Plaintiff's Complaint" against them. (Doc. #14 at 3).

[2] It appears that Corizon of Michigan was formerly known as Prison Health Services, Inc., also a named defendant in this case. (Doc. #13).

Generally, the Court will not hold a hearing on a motion in a civil case in which a party is in custody. *See* L.R. 7.1(f). Here, the Court finds that the facts and legal issues are adequately presented in the briefs and on the record, and it declines to order a hearing at this time.

## I.   RECOMMENDATION

For the reasons set forth below, **IT IS RECOMMENDED** that the Corizon Defendants' Partial Motion to Dismiss (**Doc. #14**) be **GRANTED IN PART** to the extent Hodges is attempting to assert a claim against Corizon pursuant to *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 663 (1978), and **DENIED** in all other respects.

## II.   REPORT

### A.   Background

Hodges is a State of Michigan prisoner who brings this civil rights action pursuant to 42 U.S.C. §1983 against various medical providers employed by Corizon of Michigan.[3]  (Doc. #1). In his complaint, Hodges alleges that, on November 7, 2010, while he was incarcerated at the Saginaw Correctional Facility ("SRF"), he injured his right wrist. (*Id.* at ¶¶18-19). The next day, he was treated by Defendant Buskirk, a physician's assistant, who splinted his wrist. (*Id.* at ¶¶20-21). A week later, when Hodges was still complaining of wrist pain, he was taken to the St. Mary's of Michigan Hospital emergency room, where x-rays revealed a fracture. (*Id.* at ¶¶23-26). Hodges further alleges that, from December 2010 through April 2011, he continued to complain of wrist pain to health care staff with some frequency. (*Id.* at ¶¶33-40, 50-56).

On April 22, 2011, Hodges was examined by Dr. Haverbush, an orthopedist, for the first time. (*Id.* at ¶62). Dr. Haverbush indicated that Hodges required a CT scan of his right wrist in

---

[3] Hodges also names as defendants Daniel Heyns and George Pramstaller, both of whom are employed by the Michigan Department of Corrections ("MDOC"). (Doc. #1). These defendants have not moved for dismissal of all or part of Hodges' complaint.

order to adequately evaluate his pain and decide what treatment would be appropriate.  (*Id.*).
This CT scan was performed on May 12, 2011, which showed:  "1. Chronic triquetrum bone
changes, probably from old fracture with cystic degeneration.  Moderate nearby soft tissue
swelling may reflect synovial proliferation/fluid.  2. Other degenerative-type changes including
cyst formation [in] the remaining carpal bones.  3. No acute fracture or acute bony abnormality
seen."  (*Id.* at ¶68).  Dr. Haverbush saw Hodges again on May 27, 2011, when he reviewed with
him the CT scan results; wrote a note "strongly requesting authorization to proceed with surgical
treatment of the right hand and wrist"; and indicated that there was "nothing short of operative
management that would cause any improvement in this condition."  (*Id.* at ¶72).  After approval
was eventually obtained, Dr. Haverbush performed surgery on Hodges' right wrist at
MidMichigan Medical Center – Gratiot on July 7, 2011.  (*Id.* at ¶78).  During the surgery, Dr.
Haverbush excised what he believed to be a "benign tumor," located in the "dorsal aspect of
[Hodges'] right wrist."  (*Id.* at ¶80).  When Dr. Haverbush followed up with Hodges on August
12, 2011, he noted that the pathology report on the tumor was still pending.  (*Id.* at ¶¶89-90).

On August 11, 2011, Dr. Rajiv M. Patel, an Assistant Professor of Pathology and an
Assistant Professor of Dermatology at the University of Michigan Health System, wrote a
consultation report based on his review of Hodges' pathology slides.  (*Id.* at ¶91).  Dr. Patel's
diagnosis was "Malignant giant cell tumor of tendon sheath (malignant pigmented villonodular
synovitis ["PVNS"])."  (*Id.* at ¶92).  Dr. Haverbush received Dr. Patel's pathology report on
August 17, 2011; that same day, P.A. Buskirk performed a chart update, noting that he too had
received the pathology report and discussed the case with Dr. Squier, who recommended that
Hodges follow up with Dr. Haverbush "for further evaluation and resection of the lesion."  (*Id.* at
¶¶93-95).

3

According to Hodges, he saw Dr. Haverbush again on August 26, 2011.  (*Id.* at ¶97). Hodges further alleges that on the same day, Dr. Haverbush sent a note to the MDOC "**indicating the diagnosis of a malignant giant cell tumor of the tendon sheath** and that Mr. Hodges '**Needs to be seen by oncologist in Saginaw for evaluation and I suspect radiation Tx to the Rt hand for further Tx of this malignancy**.'"  (*Id.* at ¶97 (emphasis added by Hodges)).  Dr. Haverbush's treatment note from that August 26, 2011 examination – which he indicated also would be sent to the MDOC – explicitly made clear that "[e]xcision of this mass is not sufficient treatment," and "Hodges needs to be seen at the earliest possible time by a radiation oncologist …."  (*Id.* at ¶99).  Indeed, Dr. Haverbush specifically said:  "We are insisting that follow up be done at the earliest possible time and that [the] radiation oncologist be contacted for an early appointment for Mr. Hodges."  (*Id.*).

According to Hodges, however, this did not happen.  Rather, he was seen again by P.A. Buskirk on August 29, 2011, the notes of which read as follows:  "Case discussed with Dr. Squier.  She instructed to [follow up] with an x-ray to monitor for bone deterioration and to monitor if the area is growing.  If any of these things occur, we will pursue radiation treatment."  (*Id.* at ¶102).  Hodges saw Dr. Berhane on September 9, 2011, at which time she noted that he was "being monitored, for bony erosion, with quarterly xrays, if eroded then there will be radiation treatment."  (*Id.* at ¶¶106-07).  Thus, rather than immediately sending him to a radiation oncologist – which Dr. Haverbush deemed critical – it appears that Dr. Squier, Dr. Berhane, and/or P.A. Buskirk made the decision to monitor Hodges with periodic x-rays instead.

Hodges further alleges that despite his continued complaints of pain and requests for intervention, he was not seen by a radiation oncologist (Dr. Howell) until November 23, 2011. (*Id.* at ¶¶109-28).  Dr. Howell ordered an MRI of Hodges' right wrist, which was performed on

December 12, 2011, and showed that the tumor had "recurred and grown." (*Id.* at ¶¶131-34). Moreover, a subsequent CT scan of his chest performed on January 3, 2012, showed "widespread pulmonary metastatic disease." (*Id.* at ¶135). After a lung biopsy, Hodges was seen by Dr. Rashmi Chugh, a University of Michigan oncologist, on February 15, 2012, at which time Dr. Chugh advised Hodges that he had "malignant PVNS that is metastatic to his lungs" – a "life ending disease." (*Id.* at ¶¶138-39). Dr. Chugh recommended a course of palliative radiation in an attempt to prolong Hodges' life expectancy and avoid below-elbow amputation. (*Id.* at ¶152).

In his complaint, Hodges alleges that Dr. Berhane, Dr. Squier, and P.A. Buskirk were deliberately indifferent to his serious medical need when, after being advised on August 26, 2011, that he needed to be seen by a radiation oncologist immediately, they failed to arrange for such a visit until November 23, 2011, choosing instead to "monitor" him with periodic x-rays. (*Id.* at ¶¶103-04, 108). Hodges also alleges that these defendants' inaction constituted gross negligence and allowed his cancer to progress and metastasize to his lungs to the point that it is now terminal. (*Id.* at ¶¶154, 156, 158-62). He seeks compensatory, exemplary, and punitive damages, as well as declaratory and equitable relief.

### B.     Standard of Review

A motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) tests a complaint's legal sufficiency. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing

5

*Twombly*, 550 U.S. at 556).    The plausibility standard "does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal [conduct]." *Twombly*, 550 U.S. at 556. Put another way, the complaint's allegations "must do more than create speculation or suspicion of a legally cognizable cause of action; they must show *entitlement* to relief." *League of United Latin Am. Citizens v. Bredesen*, 500 F.3d 523, 527 (6th Cir. 2007) (emphasis in original) (citing *Twombly*, 550 U.S. at 555-56).

In deciding whether a plaintiff has set forth a "plausible" claim, the court must accept the factual allegations in the complaint as true. *Id.*; *see also Erickson v. Pardus*, 551 U.S. 89, 94 (2007).   That tenet, however, "is inapplicable to legal conclusions.   Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice," to prevent a complaint from being dismissed on grounds that it fails to comport sufficiently with basic pleading requirements. *Iqbal*, 556 U.S. at 678; *see also Twombly*, 550 U.S. at 555; Ultimately, "[d]etermining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.   In making this determination, a court "may consider the Complaint and any exhibits attached thereto, public records, items appearing in the record of the case and exhibits attached to defendant's motion to dismiss so long as they are referred to in the Complaint and are central to the claims contained therein." *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008).

**C.    Analysis**

In their motion for partial dismissal, the Corizon Defendants argue that Hodges' *Monell* claim against Corizon should be dismissed because he fails to identify any policy of that entity

which caused him to suffer an injury.  (Doc. #14 at 18-20).  They also argue that Hodges'
deliberate indifference claims against Dr. Squier, Dr. Berhane, and P.A. Buskirk (Count I)
should be dismissed because Hodges failed to properly exhaust these claims.  (*Id.* at 14-18).
Finally, the Corizon Defendants argue that Count II of Hodges' complaint – entitled "Gross
Negligence, Reckless Indifference, and Willful and Wanton Misconduct" – should be dismissed
because it sounds in medical malpractice.  (*Id.* at 21-23).  Each of these arguments will be
addressed below.

*1.    Hodges Fails to State a §1983 "*Monell*" Claim against Corizon*

The law is clear that a municipality may not be held vicariously liable for the actions of
its employees under §1983. *See Connick v. Thompson*, —— U.S. ——, 131 S.Ct. 1350, 1359
(2011); *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978).  Rather, a municipality is liable
only when its official policy or custom directly causes the plaintiff's injury.  *Id.*  Accordingly, "a
plaintiff seeking to impose liability on a municipality under §1983 [must] identify a municipal
'policy' or 'custom' that caused the plaintiff's injury."  *Board of Comm'rs of Bryan County v.
Brown*, 520 U.S. 397, 403 (1997) (citing *Monell*, 436 U.S. at 694).  This rule of municipal
liability applies equally to private corporations, like Corizon, that are performing services as an
agent of the State and are therefore deemed to be state actors for purposes of §1983.  *See Street
v. Corr. Corp. of Am.*, 102 F.3d 810, 817-18 (6th Cir. 1996).  Therefore, for Hodges to state a
§1983 "*Monell*" claim against Corizon, he must identify a specific policy of Corizon's that
"directly caused [him to suffer] a deprivation of federal rights."  *Brown*, 520 U.S. at 415.  To do
so, Hodges must demonstrate one of the following:  (1) the existence of an illegal official policy
or legislative enactment; (2) that an official with final decision making authority ratified illegal
actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of
a custom of tolerance or acquiescence of federal rights violations.  *See Burgess v. Fischer*, 735

F.3d 462, 478 (6th Cir. 2013).

Hodges' complaint fails to identify any such policy by Corizon. First, the Court notes that Count I of Hodges' complaint – the only Count directed to his §1983 claims – fails even to mention Corizon,[4] and contains no allegations whatsoever about a policy or custom that he is challenging. Nor is any such purported policy or custom referenced anywhere else in Hodges' complaint. The most Hodges alleges, in one of his complaint's introductory paragraphs, is that "the Corizon entities are responsibility for formulating and implementing the policies, procedures, and staff training related to medical care in MDOC facilities, including that related to Mr. Hodges." (Doc. #1 at ¶5).

But, that allegation fails to state a claim for relief under the applicable pleading standards; *Iqbal* makes clear that such a generalized allegation that actions were taken pursuant to a policy or custom, "'devoid of further factual enhancement,'" does not state a claim for relief. *Raymond v. O'Connor*, 526 F. App'x 526, 530 (6th Cir. 2013) (quoting *Iqbal*, 556 U.S. at 678). *See also Maxwell v. Corr. Med. Servs., Inc.*, 538 F. App'x 682, 692 (6th Cir. 2013) (plaintiff's "conclusory allegations that CMS and PHS policies caused the violation of his constitutional right does not state a claim to relief that is plausible on its face"); *Wooten v. Spigner*, 2011 WL 5075692, at *4 (E.D. Mich. Sept. 8, 2011) ("[T]he complaint does not allege any specific

---

[4] Count I is clearly directed only to the individual defendants. (Doc. #1 at ¶155 (referencing conduct by the "Defendant physicians (Squier and Berhane) and physician's assistant (Buskirk)")). Hodges cannot credibly argue that his vague reference to the "Defendants' deliberate indifference" in Paragraph 157 extends Count I's allegations to Corizon. *Iqbal*, 556 U.S. at 676 ("[A] plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."). *See also Madison v. Corizon Corp.*, 2012 WL 2412064, at *2 (E.D. Mich. June 26, 2012) (dismissing Corizon because plaintiff "failed to allege facts demonstrating [its] personal involvement…"). The case of *Thomas v. City of Chattanooga*, 398 F.3d 426 (6th Cir. 2005), on which Hodges relies, is inapplicable because unlike in that case, Hodges has failed to even identify a specific policy of Corizon, let alone allege facts supporting the existence of such a policy and its impact on the care he received.

8

policies, practices, or customs which amounted to deliberate indifference or actually caused the alleged constitutional violations on the part of the individual officers."), *report and recommendation adopted*, 2011 WL 5075713 (E.D. Mich. Oct. 25, 2011).

Nor can Hodges rely on the argument that he requires discovery in order to identify the unlawful policy in question. *See Sanchez-Orozco v. Livonia Police Dep't*, 2009 WL 2922041, at *3 (E.D. Mich. Sept. 8, 2009) (rejecting the plaintiffs' argument "that they are not required to name a specific policy" at the motion to dismiss stage, and concluding that because the plaintiffs "failed to identify a specific custom or policy that caused the claimed constitutional violations" they "failed to state a claim for municipal liability.").

In sum, in the absence of any allegations connecting the denial of medical care that is at the heart of Hodges' case to a specific policy or custom of Corizon, Corizon is entitled to dismissal of Hodges' § 1983 *Monell* claim against it.

2.      *The Corizon Defendants Have Not Met Their Burden on Exhaustion*

Next, the Corizon Defendants argue that, with respect to his claims against Dr. Squier, Dr. Berhane, and P.A. Buskirk, Hodges failed to properly exhaust his administrative remedies, as required by the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. §1997e(a).  (*Id.* at 14-18).

a.      The Applicable Law and Grievance Procedure

Under the PLRA, a prisoner may not bring an action, "under [§1983] or any other Federal law," to challenge his conditions of confinement until all available administrative remedies have been exhausted.  42 U.S.C. §1997e(a); *Woodford v. Ngo*, 548 U.S. 81, 85 (2006).  This "exhaustion" requirement serves two main purposes:  it promotes efficiency by encouraging the resolution of claims at the agency level before litigation is commenced, and it protects administrative authority by allowing the agency an opportunity to correct its own mistakes before being haled into federal court.  *See Woodford*, 548 U.S. at 89.  The Supreme Court has

held that this "exhaustion requirement requires proper exhaustion." *Id.* at 93.  Proper exhaustion

requires "compliance with an agency's deadlines and other critical procedural rules." *Id.* at 90.

Failure to exhaust is an affirmative defense that must be raised by a defendant, and on which the

defendant bears the burden of proof. *See Jones v. Bock*, 549 U.S. 199, 216 (2007); *Vandiver v.*

*Corr. Med. Servs., Inc.*, 326 F. App'x 885, 888 (6th Cir. 2009).

        In determining whether a plaintiff has properly exhausted his claim, the only relevant

rules "are defined not by the PLRA, but by the prison grievance process itself." *Jones*, 549 U.S.

at 200.  In Michigan's correctional facilities, prisoner grievances are governed by MDOC Policy

Directive 03.02.130 ("Prisoner/Parolee Grievances").  (Doc. #14-2).  A state prisoner must first

complete the process outlined in the Policy – including pursuing a grievance through "all three

steps of the grievance process" – before he can file a lawsuit challenging the alleged unlawful

conduct.  (*Id.* at ¶B).  If the prisoner cannot resolve his dispute with the staff member involved,

he has five business days to file a Step I grievance.  (*Id*. at ¶¶P, V).  "Information provided [in

the Step I grievance] is to be limited to the <u>facts</u> involving the issue being grieved (i.e., who,

what, when, where, why, how).  Dates, times, places, and names of all those involved in the issue

being grieved are to be included."  (*Id.* at ¶R).  If the prisoner is dissatisfied with the Step I

response, he may submit a Grievance Appeal to the Step II Grievance Coordinator within ten

business days after receipt of the Step I response, or if no timely response is received, within ten

business days of the date the response was due.  (*Id*. at ¶BB).  If the grievant is dissatisfied with,

or does not receive, a Step II response, he has ten business days within which to file a final

appeal at Step III.  (*Id*. at ¶FF).  Again, an inmate may only pursue a claim in court if he has

complied with his obligations at each of these three steps.  (*Id.* at ¶B).

                    b.        <u>The Key Grievances Filed by Hodges</u>

        After thoroughly reviewing the documents attached to Hodges' complaint, as well as

10

those submitted by the Corizon Defendants as attachments to their reply brief, it is apparent that Hodges filed numerous grievances between the time he injured his right wrist (in November 2010) and the filing of his complaint in this case (in May 2014).  With respect to Dr. Squier, Dr. Berhane, and P.A. Buskirk, the Corizon Defendants focus on three grievances – Grievance Nos. SRF-2011-11-1630-12D1 (the "SRF Grievance"), JCF-2012-01-0127-28G (the "JCF Grievance"), and LMF-2012-02-0450-28E (the "LMF Grievance") – and argue that none of these grievances was properly exhausted.  (Doc. #14 at 16).  Thus, in order to determine whether Hodges' claims against Dr. Squier, Dr. Berhane, and P.A. Buskirk are properly exhausted, a thorough examination of these grievances is required.[5]

*(1)     The Grievances Highlighted by the Corizon Defendants*

(a)     <u>The SRF Grievance</u>

In the SRF Grievance, dated November 10, 2011, Hodges makes numerous allegations about the medical care he did and did not receive related to his wrist.  While it is true that most of his complaints in that grievance seem to relate to the alleged failure to treat his broken wrist in late 2010, rather than the failure to provide radiation treatment for his tumor in late 2011, importantly, the grievance does specifically challenge the delayed radiation for the tumor in his hand.  (Doc. #1-5 at 2-3).  Hodges, after specifically referencing that "in August 2011 the Doctor told me that I had a Tumor in my hand and in September of 2011, the Doctor told me that I had [a malignant form of cancer]," stated, "I am **<u>now at a very critical stage in which I need</u>**

---

[5] In his response brief, Hodges also mentions Grievance No. JCF-2013-09-1592-12E2.  (Doc. #22 at 13).  In this grievance, Hodges asserted that his Special Accommodation Notices – pertaining to a bottom bunk, extra bedding, etc. – were expiring and "JCF Medical staff" and Corizon were not "promptly making sure" he did not suffer.  (Doc. #24-5 at 26).  Because the incidents described in this grievance are not at issue in this lawsuit, however, the fact that Hodges pursued this grievance to Step III does not serve to exhaust any of the claims in his complaint.

**medical attention A.S.A.P. …**" (*Id.*) (emphasis added). Indeed, the grievance respondent summarized Hodges' Step I grievance as follows (in pertinent part): "I had an MRI & CT Scan & surgery in August & I was told I had a tumor in my hand. The doctor told me I had cancer cells. Because PA Buskirk denied me urgent medical treatment & I waited 5 months, I am now at a critical stage." (Doc. #24-5 at 97).

In responding to this Step I grievance, RN Alton reviewed Hodges' electronic medical record and summarized the care he was provided at SRF between November 2010 and September 2011 (when he was transferred to Alger Correctional Facility ("LMF")). (*Id.* at 97-98). RN Alton concluded that there "was no evidence of denied medical treatment" and denied the SRF Grievance at Step I. (*Id.*). In his Step II appeal, Hodges reiterated that he was challenging P.A. Buskirk's alleged refusal to act on Dr. Haverbush's "recommendation for radiation after surgery in my hand as right now had (PVNS) with malign[ant] giant cell tumor and cancer." (Doc. #1-5 at 7). Hodges further clarified, "all this time since surgery I am [being denied] radiation at SRF by Buskirk, P.A. …." (*Id.*). In RN Lamb's Step II response, however, Hodges was advised that there was no evidence that he was denied urgent treatment following his wrist injury. (Doc. #24-5 at 94). With respect to Hodges' allegation that P.A. Buskirk was denying him radiation, the grievance response indicated, "New issues[6] raised at Step II Appeal will not be addressed in this response." (*Id.*). Hodges subsequently filed a Step III appeal, which was denied, this time on the basis that: (a) Hodges originally grieved P.A. Buskirk's underline failure to respond to his letters – as opposed to his failure to provide medical treatment – and Buskirk was not required by policy to do so; and (b) the grievance was untimely, as it was dated

---

[6] As discussed in the preceding paragraph, Hodges' complaint about being denied the recommended radiation treatment was not a "new issue" presented for the first time at Step II of the grievance process.

November 10, 2011 but referred in "the body of his grievance [to] issues from November 2010," and Hodges had not "provided reasoning for the substantial delays."[7]  (Doc. #24-5 at 92).

In their motion, the Corizon Defendants argue that the SRF Grievance was not properly exhausted because it was rejected on procedural grounds as untimely.  (Doc. #14 at 16).  The applicable Policy Directive provides that a "Step I grievance must be filed within five business days after the grievant attempted to resolve the issue with appropriate staff."  (Doc. #14-2 at ¶P).  However, under the MDOC's own grievance policy, although a grievance "may be rejected" if "filed in an untimely manner," it "**shall not be rejected if there is a valid reason for the delay, e.g., transfer.**"  (*Id.* at ¶G(3) (emphasis added)).  Here, the SRF Grievance was deemed untimely because Hodges had purportedly not "provided reasoning for the substantial delays."  (Doc. #24-5 at 92).  There are several problems with this conclusion, however.

First, looking only at the face of Hodges' grievance, it is not at all clear that this grievance <u>was</u> untimely, as Hodges grieved in part P.A. Buskirk's failure to respond to a letter dated November 7, 2011 (just three days before the date of the grievance).  (Doc. #1-4 at 67).  It also addressed the denial of the radiation treatment which had been recommended only a few months prior to Hodges' submission of the grievance.  Moreover, the fact that the SRF Grievance was not rejected at Steps I or II of the grievance process further calls into question the Corizon Defendants' timeliness argument (as does the fact that the "MDOC Prisoner Step III Grievance Report" attached to the Corizon Defendants' reply brief indicates that this grievance was "Denied" at Step III, not "Rejected").  (Doc. #24-5 at 7).

But, even assuming that the SRF Grievance was untimely, the Step III contention that

---

[7] There is an inherent inconsistency in these two bases for denying the grievance:  if Hodges actually was grieving P.A. Buskirk's failure to respond to his letters, as the Step III grievance response concluded, then he was not challenging "issues from November 2010."

Hodges failed to "provide reasoning" for any delay in its filing is inaccurate. Indeed, Hodges explained in the grievance that he had undergone surgery and been diagnosed with PVNS, and it was apparent from the MDOC records that he had been transferred between facilities more than once in the intervening time period. Both of these facts could have provided a valid explanation for any delay in filing the SRF Grievance, had they been considered. *See, e.g., Bolin v. Corr. Med. Servs.*, 2007 WL 3203133, at *5 (E.D. Mich. Oct. 31, 2007) (hospital stay and medical condition were valid reasons for delay in filing grievance); *Coleman v. Gullet*, 2013 WL 2634581, at *11 (E.D. Mich. June 10, 2013) (plaintiff's transfer was conceivably a valid reason for the delay in appealing a grievance).[8]

In sum, resolving all reasonable inferences in Hodges' favor, as must be done at the motion to dismiss stage, the Corizon Defendants fail to satisfy their burden of proof on this affirmative defense, and the Court cannot conclude that Hodges failed to exhaust the SRF Grievance against P.A. Buskirk.

(b)    The JCF Grievance

On or about October 25, 2011, Hodges was transferred from LMF to the G. Robert Cotton Correctional Facility ("JCF") in Jackson, Michigan. (Doc. #1 at ¶¶126-27). Once there, Hodges filed the JCF Grievance on January 13, 2012, specifically asserting that, while he was incarcerated at LMF, Dr. Berhane "was denying/delaying requests for an off-site referral with an orthopedic specialist, acting alone or in concert with others." (Doc. #1-4 at 1). He also asserted

---

[8] Additionally, the SRF Grievance was addressed – to some extent, at least – on the merits at Steps I, II, and III. Courts have held that, under certain circumstances, procedural objections to timeliness can be waived where a grievance is addressed on the merits. *See, e.g., Christian v. Michigan Dep't of Corr. – Health Servs.*, 2013 WL 5348832, at *5 (Sept. 24, 2013) ("[W]hen the prison elects to address a grievance on the merits rather than invoke a procedural bar to the grievance, the prisoner has exhausted his claim.") (quoting *Allen v. Shawney*, 2013 WL 2480658, at *4 (E.D. Mich. June 20, 2013)); *Flentall v. Lange*, 2011 WL 1045443, at *4 (W.D. Mich. Jan. 31, 2011).

that P.A. Buskirk delayed treating him following his November 2010 injury.  (*Id.*).  And, he alleged that "Dr. Berhaney (and the others) simply threw their hands up in the air, without trying to help me get further treatment [for] my wrist or the cancer."  (*Id.*).  The JCF grievance was rejected at Step I on January 17, 2012, because "JCF lacks jurisdiction over medical treatment at LMF."  (*Id.* at 2).  Hodges was further advised:  "You may re-submit your complaint and send it to the Grievance Coordinator at LMF using ID Mail.   However; JCF takes medical issues/complaints very seriously.  Because of this, a copy of your complaint has been forwarded to the JCF HUM for review."  (*Id.*).  Although there is no clear evidence that Hodges re-submitted this grievance to LMF, there is at least some indication – based on a letter Hodges sent to the "JCF Mail Room, JCF Grievance Coordinator and ECF/DWH Mail Room" – that he attempted to do so.  (Doc. #1-5 at 158).  That letter provides as follows:

> On January 27, 2012, I was admitted at the University of Michigan Hospital for a lung biopsy.  I stayed there for roughly a day to day and a half and was then transported to [Duane Waters Health Center ("DWH")]. I was admitted to DWH until February 8, 2012, when I was discharged back to JCF.
>
> During this period of time, I am certain a piece of interdepartmental (I.D.) mail was returned to my housing unit in error.  As I was not in the housing unit, but had been admitted at the U of M, the mail was dropped back in the B Unit mail box.  To this date, that white envelope, addressed to the grievance coordinator at Alger, has not found its way back to me.
>
> If any mail was temporarily held during my transition from JCF to U of M, from U of M to DWH, then DWH to JCF, please forward it to me now. I am most grateful for your attention in this matter.

(*Id.*).  The Court has located no response to this letter in the record, nor does it appear that the JCF Grievance was pursued to Step II or Step III (and it is not listed on the "MDOC Prisoner Step III Grievance Report").  (Doc. #24-5 at 3-7).

In their motion, the Corizon Defendants argue that the JCF Grievance was properly rejected – and, thus, was not exhausted – because Hodges "submitted [it] to JCF staff, who

lacked jurisdiction over grievances pertaining to SRF and LMF." (Doc. #14 at 16). Although this fact might be correct, it is not dispositive under the circumstances. From the contents of Hodges' letter quoted above, it appears to the Court that Hodges attempted to send this grievance to LMF and that, for some unexplained reason, it was neither accepted nor returned to him for further action. That Hodges apparently was in and out of two different hospitals during the relevant time period – during which time he learned that his cancer had metastasized to his lungs – certainly might explain some of the confusion surrounding re-submission of this grievance and, indeed, could have provided a "valid reason" for any delay in filing the grievance with LMF. Where the MDOC's own grievance policy provides that a grievance shall not be rejected if there is a valid reason for the delay (Doc. #14-2 at ¶G(3)), the Court cannot conclude that Hodges failed to exhaust the JCF Grievance against Dr. Berhane.

(c)    <u>The LMF Grievance</u>

It appears that after Hodges learned that LMF had not received the JCF Grievance, he submitted the LMF Grievance. (Doc. #1-4 at 2). The LMF Grievance largely tracked the prior JCF Grievance. In the LMF Grievance, dated February 18, 2012, Hodges again asserted that, while he was incarcerated at LMF, Dr. Berhane delayed and/or denied "requests for off-site referral with an orthopedic specialist, acting alone or in concert with others." (Doc. #1-3 at 15). As with the JCF Grievance, Hodges also alleged that, "Dr. Berhane (and the others) simply threw their hands up in the air, without trying to help me get further treatment for my hand/wrist or the cancer therein." (*Id.*). The LMF Grievance was rejected as untimely at Step I, however, and Hodges was advised that the grievance investigation reveals that "you have exceeded your time limits in filing a grievance on issue(s) that concern you, and at the same time provided no reasonable circumstance beyond your control that would have prevented you from filing this

16

grievance in a timely fashion." (*Id.* at 10; Doc. #24-5 at 90). Hodges submitted a Step II appeal, explaining that he had been taking medication for his wrist pain, which produced side effects (including drowsiness, difficulty focusing, etc.). (Doc. #1-3 at 6). He further indicated that he had only recently learned who was (at least partially) responsible for denying his requests for referral to a radiation oncologist and then had been hospitalized for a period of time. (*Id.* at 6-7). Hodges' appeal was denied at Step II because (1) investigation revealed that Hodges was "provided continuous medical care while at [LMF]" and there was "no evidence of deliberate indifference" to a serious medical need, and (2) the grievance was untimely.[9] (*Id.* at 21). Hodges appealed to Step III, again arguing that he should be "granted considerable leeway in pursuing medically related appeals," given the medication he was taking, the pain he was experiencing, and the other difficulties his condition presented. (*Id.* at 23). The grievance was denied at Step III. (*Id.* at 13).

The Corizon Defendants argue that the LMF Grievance was properly rejected as untimely and, thus, was not properly exhausted. Again, however, the MDOC's own grievance policy provides that a grievance "shall not be rejected if there is a valid reason for the delay, e.g., transfer." (Doc. #14-2 at ¶G(3)). In this case, it does not appear that any consideration was given as to whether there was a valid reason for Hodges' delay in filing the grievance; rather, the Step I grievance response indicates only that Hodges "provided no reasonable circumstance

---

[9] As to the untimeliness rejection, the Step II response indicates that Hodges' "Step II Appeal was due to the Grievance Coordinator on 3/26/12; however it was not received until 4/2/12." (Doc. #1-3 at 21). Pursuant to applicable MDOC policy, however, "Grievances and grievance appeals at all steps shall be considered filed on the date sent by the grievant." (Doc. #14-2 at 5, ¶S). Here, Hodges' Step II appeal is dated March 21, 2012, and he indicates this appeal was mailed prior to the due date (March 26, 2012). The fact that Hodges was housed at JCF at the time his appeal was mailed to LMF may explain why it was not received at that facility until April 2, 2012. Thus, the evidence before the Court shows that Hodges' Step II appeal was timely filed pursuant to MDOC policy and should not have been rejected on timeliness grounds.

beyond [his] control that would have prevented [him] from filing this grievance in a timely fashion." (Doc. #1-3 at 10).

In appealing this untimeliness rejection, however, Hodges provided multiple explanations for the delay in filing this grievance. For example, he mentioned his ongoing medical treatment and medication, which he indicated caused drowsiness and "prohibit[ed] focus." (*Id.* at 6). He also indicated that he had been delayed in obtaining the names of the staff to be included in the grievance. (*Id.*). Moreover, it bears keeping in mind that Hodges first filed a nearly-identical grievance at JCF in January 2012; this grievance was rejected because JCF "lack[ed] jurisdiction over medical treatment at LMF." (Doc. #1-4 at 2). It appears that Hodges then immediately attempted to send this grievance to LMF, as instructed, but for reasons outside his control – he was hospitalized for nearly two weeks after a lung biopsy – and other reasons not entirely clear, the grievance was not immediately sent to LMF. Thus, there is at least a question of fact as to whether this grievance was properly rejected at Step I as untimely, and, consequently, the Court cannot conclude that Hodges failed to exhaust the LMF Grievance against Dr. Berhane.

### (d)      Exhaustion as to Dr. Squier

In summary, a genuine issue of material fact exists as to whether Hodges properly exhausted the SRF Grievance, the JCF Grievance, and the LMF Grievance. These grievances name only P.A. Buskirk and Dr. Berhane, however, and the Corizon Defendants argue that Hodges' failure to specifically name Dr. Squier in these grievances bars his claims against her. (Doc. #14 at 17).

It is true that proper exhaustion of administrative remedies means "using all steps that the agency holds out, and doing so properly." *Woodford*, 548 U.S. at 90. And, the applicable MDOC Policy Directive provides that grievances must include "[d]ates, times, places, and names

18

of all those involved in the issue being grieved."   (Doc. #14-2 at ¶R).   The Sixth Circuit, however, has cautioned courts against being too technical when deciding whether a prisoner's grievance has been properly exhausted.   *See LaFountain v. Martin,* 2009 WL 1546376, at *2 (6th Cir. June 3, 2009) ("It is sufficient for a court to find that a prisoner's [grievance] gave prison officials fair notice of the alleged mistreatment or misconduct that forms the basis of the constitutional or statutory claim made against a defendant in a prisoner's complaint.").   Notably, then, "[a]lthough the [MDOC] policy requires a grievance to include specific names, those requirements are relaxed when the purpose of the grievance has been achieved."   *Hall v. Raja,* 2010 WL 3070141, at *3 (E.D. Mich. Aug. 2, 2010).   In other words, "The exhaustion requirement was not designed as a web to ensnare unsophisticated prisoners in procedural technicalities, but rather to prevent inmates from using the federal courts as their *first* forum to resolve grievances."   *Hall v. Raja*, 2009 WL 6315346, at *5 (E.D. Mich. Aug. 28, 2009) (emphasis in original).

As set forth above, in both the JCF Grievance and the LMF Grievance, Hodges alleged that Dr. Berhane, "acting alone or in concert with others," denied his requests for off-site referral to an orthopedic specialist as well as treatment for his cancer.   (Docs. #1-3 at 15, 1-4 at 1). Neither of these grievances was rejected for lack of specificity, nor was Hodges asked to identify who the "others" were.   Moreover, the Step II response to the LMF Grievance specifically indicated that:   "Investigation into this matter has revealed you were provided continuous medical care while at this facility.   There is no evidence of deliberate indifference to your health care needs as you have claimed."   (Doc. #1-3 at 21).   Presumably, then, Hodges' medical record and/or history were reviewed – which would have revealed Dr. Squier's decision to monitor Hodges, rather than send him to a radiation oncologist.

19

On the present record, then, the Court cannot say that Hodges failed to comply with the "spirit and purpose of the administrative exhaustion rules" with respect to Dr. Squier. *Hall*, 2010 WL 3070141, at \*3. There is no indication that Dr. Squier ever provided direct patient care to Hodges; thus, it is certainly reasonable to infer that, at the time he filed these grievances, he had no way of knowing that she was the individual who he now alleges was making the ultimate decision not to refer him to a radiation oncologist. For these reasons, despite the fact that neither the JCF Grievance nor the LMF grievance specifically named Dr. Squier, the Court finds that, on the current record, a reasonable jury could find that these grievances gave Dr. Squier fair notice of the claims against her. *See, e.g., Stevenson v. Mich. Dep't of Corr.*, 2008 WL 623783, at \* (W.D. Mich. Mar. 4, 2008) (grievance naming specific individuals and "all those equally involved" was substantially similar to the facts alleged in Plaintiff's complaint and, thus, "gave Defendants sufficient notice to address and resolve the claim that Plaintiff brings against them in his complaint"); *Contor v. Caruso*, 2008 WL 878665, at \*3 (W.D. Mich. Mar. 28, 2008) (noting that "prisoners may not be able to learn the names of all persons involved in a situation given prisoners' limited access to information" and concluding that grievance sufficiently put prison officials on notice); *Austin v. Corr. Med. Servs.*, 2008 WL 4426342, at \*5 (W.D. Mich. Sept. 26, 2008) (grievance naming "the Medical Service Department here at M.C.F." was sufficient to exhaust claims against the named defendants).

For all of these reasons, the Court finds that the Corizon Defendants' motion to dismiss based on exhaustion grounds should be denied, and Hodges should be permitted to proceed with his Eighth Amendment denial-of-medical-care claims against Dr. Squier, Dr. Berhane, and P.A. Buskirk.

      3.       *Count II of Hodges' Complaint – Entitled "Gross Negligence, Reckless Indifference, and Willful and Wanton Misconduct" Should Not Be Dismissed*

The Corizon Defendants also argue that Count II of Hodges' Complaint (entitled "Gross Negligence, Reckless Indifference, and Willful and Wanton Misconduct") should be dismissed because it sounds in medical malpractice which imposes certain statutory requirements upon plaintiffs that Hodges has not met. (Doc. #24 at 19-21). *See* M.C.L. §600.2912. "A complaint cannot avoid the application of the procedural requirements of a malpractice action by couching its cause of action in terms of ordinary negligence." *Dorris v. Detroit Osteopathic Hosp. Corp.*, 460 Mich. 26, 43 (1999); *see also Adam v. Sisters of Bon Secours Nursing Care Center*, 2011 WL 3903146, at *4 (Mich. App. Sept. 6, 2011) (same analysis applies to claims of gross negligence).

The Michigan Supreme Court has set forth a two-part test for determining whether the nature of a claim is medical malpractice (as opposed to the plaintiff's alternate label). *See Bryant v. Oakpointe Villa Nursing Ctr., Inc.*, 471 Mich. 411, 422 (2004). First, did the alleged conduct occur "within the course of a professional relationship?" and, second, do the allegations "raise questions involving medical judgment?" *Id.*

With respect to the first issue, the Michigan Supreme Court has defined a professional relationship as one in which "a licensed health care professional, licensed health care facility, or the agents or employees of a licensed health care facility, were subject to a contractual duty that required that professional, that facility, or the agents or employees of that facility, to render professional health care services to the plaintiff." *Id.* In this case, it is clear that the conduct at issue occurred within the course of a professional relationship, as Hodges alleges that the Corizon Defendants provided medical care to him. (Doc. #1).

The second *Bryant* question presents a closer call. In determining whether a plaintiff's

21

allegations raise questions involving medical judgment, the Michigan Supreme Court has noted that, "If the reasonableness of the health care professionals' action can be evaluated by lay jurors, on the basis of their common knowledge and experience, it is ordinary negligence." *Bryant*, 471 Mich. at 423. If, however, "the reasonableness of the action can be evaluated by a jury only after having been presented the standards of care pertaining to the medical issue before the jury explained by experts, a medical malpractice claim is involved." *Id.* Allegations regarding staffing decisions and patient monitoring often involve questions of professional medical judgment that are not considered matters jurors can judge by their common knowledge and experience. *See Fisher v. County of Macomb*, 2011 WL 2414413, at *14 (E.D. Mich. June 14, 2011) (citing *Bryant*, 471 Mich. at 426). The *Fisher* court also noted, however, that not all matters in this area require expert testimony, explaining that "a claim that the defendants did *nothing* in response to a known risk could be evaluated based on common experience if it was clear that something should have been done." *Id.* at *15 (citing *Bryant*, 471 Mich. at 430).

At least at this stage of the case, the Corizon Defendants have not shown that application of the *Bryant* test to the claims in Count II of Hodges' complaint compels a conclusion that those claims sound in malpractice: Hodges has made allegations from which one could conclude, based on "common knowledge and experience," that the Corizon Defendants' actions in declining to send Hodges to a radiation oncologist were unreasonable.

Hodges alleges that, on August 26, 2011, Dr. Haverbush sent a note to the MDOC indicating that he needed to be seen by an oncologist immediately for evaluation and radiation. (Doc. #1 at ¶97). Dr. Haverbush's treatment note from that same day made clear that "[e]xcision of this mass is not sufficient treatment," and "Hodges needs to be seen at the earliest possible time by a radiation oncologist …." (*Id.* at ¶99). Indeed, Dr. Haverbush specifically said: "<u>We</u>

are insisting that follow up be done at the earliest possible time and that this radiation oncologist be contacted for an early appointment for Mr. Hodges." (*Id.* (emphasis added)). Hodges also alleges that in response to his doctor's instruction that immediate and specialized medical attention was required, the Defendants, who controlled the medical care that Hodges would and would not receive, refused to allow him to obtain that medical care, and instead chose to "monitor" him with "quarterly x-rays." (*Id.* at *e.g.*, ¶¶ 103-04, 107-08, 121).

Given these facts, Hodges' allegations as to the Corizon Defendants' actions are akin to a claim that they "did nothing in response to a known risk," which is a matter of negligence, not medical malpractice. *Jones v. Corr. Med. Servs., Inc.*, 845 F. Supp. 824, 846 (W.D. Mich. 2012) (citing *Bryant*, 471 Mich. at 430-31); *see also Fisher*, 2011 WL 2414413, at *15 (same).

For these reasons, the Corizon Defendants' motion to dismiss Count II of Hodges' complaint should be denied.[10]

## III.   CONCLUSION

For the reasons set forth above, **IT IS RECOMMENDED** that the Corizon Defendants' Motion to Dismiss (**Doc. #14**) be **GRANTED** as to Hodges' *Monell* claim against Corizon and

---

[10] Hodges filed his complaint on May 7, 2014, and the Corizon Defendants argue that they are entitled, under the applicable statute of limitations, to dismissal of Hodges' claims which accrued prior to May 7, 2011. (Doc. #14 at 23-24). They are correct that Hodges' §1983 claim is subject to a three-year statute of limitations, and Hodges does not argue otherwise. *See, e.g., Jones v. Richardson*, 2008 WL 907383, at *9 (E.D. Mich. Mar. 31, 2008). However, it does not appear to the Court that Hodges is asserting claims based on acts that occurred prior to May 7, 2011. Rather, Hodges' claims against the Corizon Defendants appear to arise out of their failure or refusal to send him to a radiation oncologist after August 26, 2011. (Doc. #1 at *e.g.*, ¶156 ("The Defendant physicians demonstrated deliberate indifference by failing to follow up on or honor Dr. Haverbush's recommendation and insistence that Mr. Hodges be seen right away by a radiation oncologist."); ¶159 ("The Defendants' repeated failures to provide timely care and treatment…of Mr. Hodges' life-threatening disease…constitute[s] gross negligence…")). The Court construes the references in Hodges' complaint to events that occurred outside the limitations period as having been made to provide background information regarding his claims. Thus, this portion of the Corizon Defendants' motion should be denied as moot, without prejudice in the event Hodges later attempts to raise claims which accrued prior to May 7, 2011.

**DENIED** in all other respects.


Dated: February 6, 2015              s/David R. Grand
Ann Arbor, Michigan                DAVID R. GRAND
                                United States Magistrate Judge

## NOTICE TO THE PARTIES REGARDING OBJECTIONS

Within 14 days after being served with a copy of this Report and Recommendation and Order, any party may serve and file specific written objections to the proposed findings and recommendations and the order set forth above. *See* 28 U.S.C. §636(b)(1); Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d)(1). Failure to timely file objections constitutes a waiver of any further right of appeal. *See Thomas v. Arn*, 474 U.S. 140, (1985); *United States v. Sullivan,* 431 F.3d 976, 984 (6th Cir. 2005). Only specific objections to this Report and Recommendation will be preserved for the Court's appellate review; raising some objections but not others will not preserve all objections a party may have. *See Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987); *see also Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596-97 (6th Cir. 2006). Copies of any objections must be served upon the Magistrate Judge. *See* E.D. Mich. LR 72.1(d)(2).

A party may respond to another party's objections within 14 days after being served with a copy. *See* Fed. R. Civ. P. 72(b)(2); 28 U.S.C. §636(b)(1). Any such response should be concise, and should address specifically, and in the same order raised, each issue presented in the objections.


## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class

U.S. mail addresses disclosed on the Notice of Electronic Filing on February 6, 2015.

s/Eddrey O. Butts
EDDREY O. BUTTS
Case Manager