UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SHAWN HODGES,

                    Plaintiff,

      v.

CORIZON, CORIZON OF MICHIGAN,
PRISON HEALTH SERVICES, INC.,
HARRIET A. SQUIER, M.D., ASTER
BERHANE, M.D., JOSHUA A.
BUSKIRK, P.A., DANIEL A. HEYNS,
and GEORGE PRAMSTALLER,

                    Defendants.

Civil Action No. 14-11837
Honorable John Corbett O'Meara
Magistrate Judge David R. Grand

_____/

## REPORT AND RECOMMENDATION TO GRANT
## IN PART AND DENY IN PART THE CORIZON
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [46]

      Before the Court is a Motion for Summary Judgment filed on February 19, 2016, by three individual defendants employed at all relevant times by Corizon of Michigan:  Harriet Squier, M.D., Joshua Buskirk, P.A., and Aster Berhane, M.D. (collectively the "Corizon Defendants"). (Doc. #46).  Plaintiff Shawn Hodges ("Hodges"), an incarcerated person who is represented by counsel, filed a response in opposition to this motion on March 29, 2016 (Doc. #51), and the Corizon Defendants filed a reply on April 13, 2016 (Doc. #55).  The Court held oral argument on this motion on May 13, 2016, and the matter is now ripe for ruling.[1]

## I.    RECOMMENDATION

      For the reasons set forth below, **IT IS RECOMMENDED** that the Corizon Defendants' Motion for Summary Judgment (**Doc. #46**) be **GRANTED IN PART** with respect to Count II of

_____

[1] An Order of Reference was entered on May 8, 2014, referring all pretrial matters to the undersigned pursuant to 28 U.S.C. §636(b).  (Doc. #3).

Hodges' complaint, and **DENIED IN PART** with respect to Count I.

## II.    REPORT

### A.    Factual Background

#### 1.    *Hodges Injures His Wrist and Undergoes Surgery*

Hodges is a State of Michigan prisoner who brings this civil rights action pursuant to 42 U.S.C. §1983, alleging that Dr. Squier, Dr. Berhane, and PA Buskirk were deliberately indifferent to his serious medical needs.[2]  (Doc. #1).  In his complaint, Hodges alleges that, on November 7, 2010, while he was incarcerated at the Saginaw Correctional Facility ("SRF"), he injured his right wrist.  (*Id.* at ¶¶18-19).  The next day, he was treated by PA Buskirk, who splinted his wrist.  (*Id.* at ¶¶20-21).  A week later, when Hodges was still complaining of wrist pain, he was taken to the emergency room at St. Mary's of Michigan Hospital, where x-rays revealed a fracture.  (*Id.* at ¶¶23-26).  Hodges further alleges that, from December 2010 through April 2011, he continued to complain of wrist pain to SRF health care staff with some frequency. (*Id.* at ¶¶33-40, 50-56).

On April 22, 2011, Hodges was examined by Thomas Haverbush, M.D., an orthopedist, for the first time.  (*Id.* at ¶62).  Dr. Haverbush indicated that Hodges required a CT scan of his right wrist in order to adequately evaluate his pain and decide what treatment would be appropriate.  (*Id.*).  This CT scan was performed at St. Mary's of Michigan on May 12, 2011, and showed:  "1. Chronic triquetrum bone changes, probably from old fracture with cystic degeneration.  Moderate nearby soft tissue swelling may reflect synovial proliferation/fluid.  2.

---

[2] Hodges' claims against the other named defendants were all dismissed by previous orders of this Court.  Additionally, the Corizon Defendants argue in their motion that summary judgment is warranted as to Count II of Hodges' complaint (captioned "Gross Negligence, Reckless Indifference, and Willful and Wanton Misconduct") because he did not satisfy the procedural and statutory requirements (in M.C.L. §600.2912, *et seq.*) for bringing such a claim.  (Doc. #46 at 39-44).  In his response brief, Hodges does not address, much less oppose this argument.  As such, summary judgment should be granted on Count II of Hodges' complaint.

Other degenerative-type changes including cyst formation [in] the remaining carpal bones.  3. No acute fracture or acute bony abnormality seen."  (Doc. #46 at Ex. C, p. 41).  After Dr. Haverbush reviewed the CT scan results, he requested a follow-up appointment with Hodges on May 27, 2011.  (*Id.* at Ex. C, p. 45).  At that time, Dr. Haverbush wrote a note requesting authorization to proceed with surgical treatment of the right hand and wrist, and he indicated that there was "nothing short of operative management that would cause any improvement in this condition." (Doc. #51, at Ex. 1, pp. B000009-10).  After approval was obtained, Dr. Haverbush performed surgery on Hodges' right wrist at MidMichigan Medical Center – Gratiot on July 7, 2011.  (Doc. #46 Ex. F, pp. E000011-12).  During the surgery, Dr. Haverbush excised what he believed to be a "benign tumor" located in the "dorsal aspect of [Hodges'] right wrist."  (*Id.*).

> 2.  *After Surgery and Review of the Pathology Report, which Showed a Malignant Tumor, the Surgeon "Insists" that Hodges See a Radiation Oncologist "at the Earliest Possible Time"*

On July 22, 2011, Hodges had his first post-surgical follow-up visit with Dr. Haverbush. (*Id.* at Ex. C, p. 70).  Dr. Haverbush removed Hodges' sutures and applied a new cast, noting that Hodges was "fairly comfortable and doing well."  (*Id.*).  Dr. Haverbush next saw Hodges on August 12, 2011, at which time he noted that the pathology report on the tumor removed from Hodges' right wrist was still pending.  (*Id.* at Ex. C, p. 73).

On August 17, 2011, Dr. Haverbush received this pathology report from Dr. Rajiv Patel at the University of Michigan.  (*Id.* at Ex. F, pp. E000013-16).  Dr. Patel said, in relevant part, that the lesion was "best considered a malignant tenosynovial giant cell tumor (malignant pigmented villonodular synovitis ["PVNS"])."  (*Id.*).  Dr. Patel further indicated that, given the rarity of these tumors, he had shared the case with colleagues at the University of Michigan and the Cleveland Clinic "in order to reach a consensus diagnosis."  (*Id.*).

Later the very same day, Dr. Haverbush sent a note to PA Buskirk regarding the pathology report, indicating that it showed "malignant tenosynovial giant cell tumor (malignant pigmented villonodular synovitis" and saying that it was "very important that [he] be authorized to see the patient again on August 26, 2011 …." (Doc. #51 at Ex. 1, p. B000004). In the cover memo (to which he indicated he had attached the pathology report), Dr. Haverbush further stated that Hodges "**[n]eeds to be seen by oncologist in Saginaw for evaluation and I suspect radiation [treatment] to the right hand for further [treatment] of this malignancy.**" (Doc. #46 at Ex. C, pp. 86-87 (emphasis added)).

On August 18, 2011, PA Buskirk reviewed Dr. Haverbush's note and documented as follows: "Received the pathology report of the biopsy of the lesion on the [patient's] injured wrist. The biopsy revealed a malignant giant cell tumor of tendon sheath (malignant pigmented villonodular synovitis). Case discussed with Dr. Squier[3] who recommended [follow up] with Dr. Haverbush for further evaluation and resection of the lesion. A [request] for [follow up] with Dr. Haverbush was already submitted on 8/16/11. Dr. Haverbush requested [follow up] on 8/26/11." (*Id.* at Ex. C, p. 82 (footnote added)). PA Buskirk then met with Hodges on August 22, 2011, noting: "[Patient] presents to explain the pathology results. Explained to [patient] the diagnosis of malignant giant cell tumor of the tendon sheath. Explained the [follow up] plan of care. [Patient] has a scheduled [follow up] with Dr. Haverbush on 8/26/11. [Patient] verbalized

---

[3] There is some dispute as to exactly what was communicated between PA Buskirk and Dr. Squier during this conversation. PA Buskirk testified at his deposition that he read Dr. Haverbush's report to Dr. Squier (including conveying that the diagnosis was malignant PVNS). (Doc. #51 at Ex. 5, pp. 26, 70). At her deposition, however, Dr. Squier testified that PA Buskirk did not tell her that Hodges' tumor was malignant. (*Id.* at Ex. 6, pp. 34, 41-42). Thus, it appears that PA Buskirk and Dr. Squier contradict each other as to whether Dr. Squier was told at this time about the malignant nature of the pathology findings; indeed, Dr. Squier testified that the first time she had any indication the tumor was malignant was not until October 12, 2011. (*Id.* at Ex. 6, p. 45). Dr. Squier testified that, had she known the tumor was malignant, she might have taken different actions. (*Id.* at Ex. 6, pp. 34-35).

understanding." (*Id.* at Ex. C., p. 85).

On August 26, 2011, Hodges presented for this follow-up visit with Dr. Haverbush, whose notes state as follows:

> The right hand/wrist mass requires further treatment.
>
> **Excision of this malignant mass is not sufficient treatment.**
>
> It is very difficult to totally excise the tumor and **further management of this is essential.**
>
> **Mr. Hodges needs to be seen at the earliest possible time by a radiation oncologist who could determine what further management of this tumor should be. This probably would be radiation but it would be up to the radiation oncologist to decide that. This is not something I would direct.**
>
> *        *        *
>
> **We are insisting that follow up be done at the earliest possible time and that this radiation oncologist be contacted for an early appointment for Mr. Hodges.**

(Doc. #51 at Ex. 1, pp. B000002-3 (emphasis added)).

On August 29, 2011, PA Buskirk saw Hodges again. On examination, PA Buskirk noted that, on the dorsal surface of his right wrist, Hodges had a 1.5 cm nodule that is diagnosed as "a malignant giant cell tumor." (Doc. #46 at Ex. C, pp. 90-91). PA Buskirk further stated:

> 1) Case discussed with Dr. Squier. **She instructed to [follow up] with an x-ray to monitor for bone deterioration and to monitor if the area is growing. If any of these things occur, we will pursue radiation treatment."** Pt verbalized understanding. 2) X-ray was completed on Friday, will review results once they return. 3) [Follow up] 1 month ….

(*Id.* (emphasis added)). PA Buskirk admitted at his deposition that Dr. Squier's instruction to merely monitor Hodges with follow-up x-rays was markedly different from Dr. Haverbush's directive to refer him immediately to a radiation oncologist. (Doc. #51 at Ex. 5, pp. 120-21). He also testified that, because he was already awaiting the x-ray report from Hodges' August 26,

5

2011 x-ray, he did not order another x-ray; rather, he scheduled a follow-up visit with Hodges for September 22, 2011. (*Id.* at Ex. 5, pp. 37-38). In the meantime, however, on September 7, 2011, a Transfer Order was signed, transferring Hodges from SRF to Alger Correctional Facility ("LMF"). (Doc. #46 at Ex. B, p. 5). For that reason, PA Buskirk had no further involvement in Hodges' medical care.[4]

### 3.    Treatment Provided After Hodges' Transfer to LMF

On September 8, 2011, Regional Medical Director Jeffrey Bomber, D.O. sent an email to Dr. Berhane, a physician at LMF, and Dr. Squier (among others) indicating that he had received a telephone call from Dr. Haverbush regarding Hodges' "malignant giant cell tumor," that Hodges was "a new ride to Alger from Saginaw," and that he needed to be seen "ASAP." (Doc. #46 at Ex. H, p. 2).[5] Dr. Bomber also instructed Dr. Berhane (and the other e-mail recipients, which included Dr. Squier) to "review the EMR, paper charts, Consultations, etc…." (*Id.*).

A few minutes later, Dr. Squier responded to the email, citing an "Up to Date" article regarding Hodges' diagnosis and explaining that, per the medical literature, his diagnosis at that time was one that "is not necessarily considered a malignant process." (*Id.* at Ex. H, p. 2). Dr. Squier went on to state:

> It was my understanding that the nodule had been excised. If the nodule was simply biopsied, then excision would be in order. I would think this

---

[4] It does appear, though, that PA Buskirk received and reviewed a paper copy of the report from the August 26, 2011 x-ray after Hodges transferred to LMF. The Corizon Defendants apparently believe that PA Buskirk was under no obligation to do anything with this information because, "Hodges was in the care of Aster Berhane, M.D. at that time, and there was a copy of the x-ray report in Mr. Hodges' electronic medical record as well." (Doc. #46 at 21, n. 1). The results of the August 26, 2011 x-ray showed an old avulsion fracture of the triquetrum bone, as well as persistent soft tissue swelling over the dorsum of the wrist. (*Id.* at Ex. C, p. 88).

[5] This e-mail seems to flatly contradict Dr. Squier's testimony that the first indication she had that Hodges had a *malignant* tumor was not until October 12, 2011. *See supra* fn. 3. And, Dr. Squier specifically testified that she would characterize "a malignant tumor … as cancer." (Doc. #51 at Ex. 6, p. 23).

> could be accomplished by an orthopedist in the UP.  **IF the tendon sheath has already been excised, then monitoring the area should be sufficient; you would get xrays every quarter to monitor for bony erosion.  Radiation treatment could be considered if the tumor recurs or grows.**

(*Id.* (emphasis added)).   Dr. Bomber then forwarded Dr. Squier's response to Dr. Berhane, asking her to "confirm the lesion was excised, etc."  (*Id.*).

Hodges arrived at LMF on September 9, 2011, at which point he was seen by Dr. Berhane for the first time.  Dr. Berhane noted Hodges' history – including his July 2011 surgery and his diagnosis of malignant giant cell tumor of the tendon sheath and villonodular synovitis.[6] (Doc. #46 at Ex. C, pp. 100-02).  She further noted that he was "being monitored, for bony erosion, with quarterly xrays, if eroded then there will be radiation treatment."  (*Id.*).  Dr. Berhane also documented that Hodges was complaining of severe pain and was intolerant of Ultram.  She started him on Tegretol, ordered lab work, and scheduled a follow-up appointment for September 15, 2011.  (*Id.*).  Dr. Berhane emailed Dr. Bomber the same day to report that she had seen Hodges and "discussed the plan with him."  (Doc. #46 at Ex. H, p. 1).

Dr. Berhane next saw Hodges on September 15, 2011, at which time she noted that Tegretol was more effective than Ultram and, when Hodges indicated that he "was supposed to have follow up xray of his right wrist," she ordered this x-ray (which was subsequently done on September 21, 2011).  (Doc. #46 at Ex. C, pp. 103-06).

---

[6] At her deposition, Dr. Berhane testified somewhat equivocally as to her understanding of Hodges' diagnosis.  In response to a question asking her, "When did you first learn that [] Hodges had cancer?," Dr. Berhane responded, "…September 9th,[2011,] through an e-mail from Dr. Bomber…I learned that he had villonodular – hyperpigmented villondular synovitis."  (Doc. #51 at Ex. 7, p. 5.).  However, she was then asked, "Is that cancer," to which she responded, "Not per the radiologists or not per medical literature that I've reviewed," one principal source of which was Wikipedia.  (*Id.* at pp. 5, 178-181).  At the same time, Dr. Berhane admits that on September 8, 2011, she received Dr. Bomber's e-mail which specifically refers to a "malignant giant cell tumor."  (*Id.* at 7; Doc. #46 at Ex. H, p. 2).

On September 27, 2011, Dr. Berhane reviewed the report from Hodges' September 21, 2011 wrist x-ray, which stated: "Severe destruction of the pisiform and triquetrum with lunate involvement although not as much as the former. Abnormal alignment of the scaphoid. Recommend hand surgery consult." (*Id.* at Ex. C, p. 107). That same day, Dr. Berhane again saw Hodges, who reported experiencing progressively worsening pain and swelling in his hand. (*Id.* at Ex. C, pp. 108-10). On examination, Dr. Berhane noted that the swelling in Hodges' hand appeared to be "slightly worse than previous," and there was a small nodule (approximately 3 millimeters by 7 millimeters), which was "very, very tender." (*Id.*). Dr. Berhane also noted that "in reviewing literature, [PVNS] is very painful and difficult to treat condition." (*Id.*). She documented that she planned to discuss the x-ray report with utilization management. (*Id.*).

Also on September 27, 2011, Dr. Berhane emailed Dr. Bomber, describing Hodges' history and indicating that he was continuing to complain of severe pain and soft tissue swelling. She then stated: "I believe that consideration of radiation therapy was the next step …. The literature states it is very difficult to treat. **I am wondering if he is having a recurrence that fast. I would like to push for radiation.**" (Doc. #46 at Ex. H, pp. 4-5 (emphasis added)).

On September 28, 2011, Dr. Bomber forwarded Dr. Berhane's message to utilization management physician Adam Edelman, M.D. (Doc. #46 at Ex. H, p. 4). Dr. Edelman responded the same day, asking whether a biopsy had confirmed the diagnosis and stating that he would discuss the case with Dr. Kosierowski (an oncologist with whom he regularly consulted). (*Id.*). Both Dr. Bomber and Dr. Berhane responded to Dr. Edelman's email, expressing their belief that a confirmatory biopsy was in the chart. (*Id.*).

On September 29, 2011, Dr. Berhane evaluated Hodges again after Hodges kited about numbness and swelling in his hand (on September 27, 2011). (*Id.* at Ex. C, pp. 111-14). Dr.

Berhane discussed the recent x-ray report with Hodges, prescribed Pamelor and Mobic for pain relief (since Tegretol was not working), provided him with "educational material on pigmented [sic] villonodular synovitis from internet," and indicated that she would "continue to monitor" him. (*Id.*).

Dr. Berhane next saw Hodges on October 6, 2011, when she noted a "small knot spindle shaped appears to be [slightly] larger about 10 mm in length and 5 mm in its widest dimension." (*Id.* at Ex. C, pp. 115-17). She instructed Hodges to continue using Mobic, increased his Pamelor dose, and said she would "continue to monitor." (*Id.*). She also noted that she had discussed the case with the Utilization Manager (Dr. Squier) and the Regional Medical Director (Dr. Bomber) and that a "request for radiation oncologist consult [was] being reviewed as well." (*Id.*). According to the Corizon Defendants, however, rather than approve Hodges to see a radiation oncologist, "The consensus was that the first step would be to obtain a second opinion from an orthopedic surgeon; therefore Dr. Berhane submitted a [request] on October 12, 2011 for a consult with Richard Ganzhorn, M.D., which Dr. Squier approved the same day." (Doc. #46 at 24 (citing Doc. #46 at Ex. C, pp. 118-19)). In other words, an orthopedic consult (rather than a radiation consult) was approved.

When Hodges subsequently saw Dr. Ganzhorn (the orthopedist) on October 17, 2011, he agreed with Dr. Haverbush's recommendation (made some two months earlier) that a referral to radiation oncology was necessary. (Doc. #51 at Ex. 15, p. A000002). As a result, Dr. Berhane submitted a request for radiation therapy on October 18, 2011. Dr. Squier approved this request, but not until October 27, 2011. (Doc. #46 at Ex. C, pp. 120-21, 125-26). In the meantime, Dr. Berhane saw Hodges again on October 21, 2011, at which time Hodges complained that his pain was worse and stated that "the specialist" (presumably Dr. Ganzhorn) had recommended

9

"radiation as soon as possible so there is no further destruction of bone and hand amputation." (*Id.* at Ex. C, pp. 122-24). Dr. Berhane increased Hodges' pain medication and documented that she would follow up with utilization management regarding radiation therapy. (*Id.*).

On November 2, 2011, Hodges was transferred to G. Robert Cotton Correctional Facility ("JCF") in Jackson, Michigan, in preparation for his radiation oncology consult. Dr. Berhane had no further involvement in Hodges' medical care after this transfer.

### 4.    *Treatment Provided After Hodges' Transfer to JCF*

Hodges was evaluated by David Howell, M.D. at the Ingham Regional Medical Center Radiation Oncology Department on November 23, 2011. (Doc. #46 at Ex. K, pp. 1-5). Dr. Howell recommended a chest CT to evaluate whether there was metastatic disease, as well as an MRI of the right hand and wrist to evaluate whether there was a recurrence of the disease there. (*Id.*). A December 12, 2011 MRI showed:

> … a 4.3 x 3.5 x 5.9 cm tumor occupying a large portion of the ulnar aspect of the right wrist. The mass extended into the bones of the mid- and medial wrist. The tumor mass replaced a majority of the pisiform bone. The triquetrum was completely replaced by tumor.

(Doc. #51 at Ex. 8, p. A000002).

Hodges was finally examined by an oncologist, J. Sybil Biermann, M.D., at the University of Michigan Medical Center on December 21, 2011. Dr. Biermann noted that it was obvious the tumor had "recurred and grown" since Hodges' initial surgery. (*Id.* at Ex. 9). Tests revealed multiple bilateral pulmonary nodules, and a January 26, 2012 biopsy confirmed metastatic high-grade unclassified sarcoma. (*Id.* at Ex. 8, p. A000002). On March 21, 2012, Jacquelyn R. Watson, M.D., a radiation oncologist wrote:

> Mr. Hodges presents with a very difficult situation with a very bulky sarcoma of the right wrist causing significant pain. **He does have pulmonary metastases and therefore has incurable malignancy. I do recommend radiation therapy to the right wrist in hopes of relieving**

10

> **or significantly decreasing the pain.   In addition, a goal of the radiation therapy would be to hopefully prevent the patient from needing an amputation of the distal right arm.**  I did discuss with Mr. Hodges that the radiation therapy is palliative and that **since he has pulmonary metastases, his malignancy is incurable ….**

(*Id.* at Ex. 8, p. A000003 (emphasis added)).  Since 2012, Hodges has continued to treat at the University of Michigan, undergoing palliative radiation, palliative chemotherapy, testing, and other procedures.  However, in January 2015, he underwent a trans-humeral amputation of his right arm.  (Doc. #46 at Ex. K, pp. 23-31).

5.     <em>Hodges Files the Instant Civil Action</em>

Hodges filed his complaint in this action on May 7, 2014.  (Doc. #1).  In his complaint, Hodges alleges that Dr. Berhane, Dr. Squier, and PA Buskirk were deliberately indifferent to his serious medical needs when, after being advised as early August 17, 2011, that he needed to be seen by a radiation oncologist immediately, they failed to arrange for such a visit until November 23, 2011, choosing instead to "monitor" him with periodic x-rays.  Hodges alleges that, as a result of the Corizon Defendants' deliberate indifference, his cancer was allowed to progress and metastasize to his lungs to the point that it is now terminal and has required the amputation of his right arm.  He seeks compensatory, exemplary, and punitive damages, as well as declaratory and equitable relief.

**B.     Standard of Review**

Federal Rule of Civil Procedure 56 provides: "The Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Pittman v. Cuyahoga County Dep't of Children & Family Servs.*, 640 F.3d 716, 723 (6th Cir. 2011).  A fact is material if it might affect the outcome of the case under governing law.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In determining whether a genuine issue of material fact exists,

the court assumes the truth of the non-moving party's evidence and construes all reasonable inferences from that evidence in the light most favorable to the non-moving party.  *See Ciminillo v. Streicher*, 434 F.3d 461, 464 (6th Cir. 2006).

The party seeking summary judgment bears the initial burden of informing the court of the basis for its motion, and must identify particular portions of the record that demonstrate the absence of a genuine dispute as to any material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009).  "Once the moving party satisfies its burden, 'the burden shifts to the nonmoving party to set forth specific facts showing a triable issue.'"  *Wrench LLC v. Taco Bell Corp.,* 256 F.3d 446, 453 (6th Cir. 2001) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986)).  In response to a summary judgment motion, the opposing party may not rest on its pleadings, nor "'rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact' but must make an affirmative showing with proper evidence in order to defeat the motion." *Alexander*, 576 F.3d at 558 (quoting *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1479 (6th Cir. 1989)).

### C.    Analysis

In their motion, the Corizon Defendants argue that summary judgment is appropriate on Hodges' Eighth Amendment claim because the evidence establishes that they were not deliberately indifferent to his serious medical needs.  (Doc. #46 at 28-39).  They further argue that Hodges' claim fails because he cannot show that any delay in his medical treatment detrimentally affected his condition.  For the reasons set forth below, the Court disagrees.

### 1.    *The Applicable Legal Standards*

In order to succeed on a deliberate indifference claim, a plaintiff must satisfy two elements – one objective and one subjective.  Specifically, he must show that he had a serious

medical need (the objective prong) and that the defendants, being aware of that need, acted with deliberate indifference to it (the subjective prong). *See Jones v. Muskegon County*, 625 F.3d 935, 941 (6th Cir. 2010).

With respect to the objective prong, a serious medical need must be more than "mere discomfort or inconvenience." *Talal v. White*, 403 F.3d 423, 426 (6th Cir. 2005) (internal quotations omitted). Here, the Corizon Defendants do not seriously contend that the objective prong of Hodges' Eighth Amendment claim is not satisfied; indeed, Dr. Berhane and PA Buskirk both admitted at their depositions that Hodges' tumor was a serious medical need. (Doc. #51 at Ex. 5, pp. 13-14 and Ex. 7, pp. 134-35). Thus, this prong of Hodges' Eighth Amendment claim is easily satisfied.

At issue in this case is the subjective component of Hodges' deliberate indifference claim. To satisfy this prong of the test, the plaintiff must show that the defendants possessed "a 'sufficiently culpable state of mind,' rising above negligence or even gross negligence and being 'tantamount to intent to punish.'" *Broyles v. Corr. Medical Servs., Inc.,* 478 F. App'x 971, 975 (6th Cir. 2012) (quoting *Horn v. Madison County Fiscal Court*, 22 F.3d 653, 660 (6th Cir. 1994)). Put another way, "[a] prison official acts with deliberate indifference if he knows of a substantial risk to an inmate's health, yet recklessly disregards the risk by failing to take reasonable measures to abate it." *Broyles,* 478 F. App'x at 975 (internal quotations omitted).

As the Sixth Circuit has recognized, the requirement that the official subjectively perceived a risk of harm and then disregarded it is "meant to prevent the constitutionalization of medical malpractice claims; thus, a plaintiff alleging deliberate indifference must show more than negligence or the misdiagnosis of an ailment." *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001). The *Comstock* court further explained:

> When a prison doctor provides treatment, albeit carelessly or inefficaciously, to a prisoner, he has not displayed a deliberate indifference to the prisoner's needs, but merely a degree of incompetence which does not rise to the level of a constitutional violation.  On the other hand, a plaintiff need not show that the official acted 'for the very purpose of causing harm or with knowledge that harm will result.'  Instead, 'deliberate indifference to a substantial risk of serious harm to a prisoner is the equivalent of recklessly disregarding that risk.'

*Id.* (internal citations omitted).

However, mere differences of opinion or disagreements between a prisoner and prison medical staff over the kinds of treatment a prisoner needs do not rise to the level of deliberate indifference.  *See Umbarger v. Corr. Med. Servs.*, 93 F. App'x 734, 736 (6th Cir. 2004).  Courts distinguish between "cases where the complaint alleges a complete denial of medical care and those cases where the claim is that a prisoner received inadequate medical treatment."  *Alspaugh v. McConnell,* 643 F.3d 162, 169 (6th Cir. 2011) (internal quotations omitted).  "Where a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law."  *Westlake v. Lucas*, 537 F.2d 857, 860 n.5 (6th Cir. 1976).  Moreover, where, as here, there are multiple defendants, the Court must evaluate the subjective prong individually for each defendant.  *See Garretson v. City of Madison Heights*, 407 F.3d 789, 797 (6th Cir. 2005).

>   2.   *Hodges Has Created a Genuine Issue of Material Fact as to the Corizon Defendants' Deliberate Indifference to His Serious Medical Needs*

Viewing the evidence discussed above in the light most favorable to Hodges, which the Court must do at the summary judgment stage, *Pack v. Damon Corp.*, 434 F.3d 810, 813 (6th Cir. 2006), Hodges has created a genuine issue of material fact as to whether each of the individual defendants was deliberately indifferent to his serious medical needs.

14

With respect to PA Buskirk, the Corizon Defendants argue that he was not deliberately indifferent because "he discussed Dr. Haverbush's recommendations with Dr. Squier," and it was she who recommended a different course of treatment.  (Doc. #46 at 30-31).  They further assert that, after he conveyed this course of action to Hodges on August 29, 2011, PA Buskirk scheduled a follow-up appointment for Hodges on September 22, 2011; however, Hodges transferred to LMF before that appointment could take place.  (*Id.*).  According to the Corizon Defendants, then, PA Buskirk was not deliberately indifferent to a serious medical need; rather, he simply "never had the opportunity" to properly implement the treatment plan "due to Mr. Hodges' unexpected transfer to another facility."  (*Id.* at 31).

If the facts bear out that way, a jury may well find that PA Buskirk did not act with deliberate indifference towards Hodges' serious medical needs when he accepted Dr. Squier's approach to simply "monitor" the area in question.  (Doc. #46 at Ex. C, pp. 90-91; *but see* Doc. #51 at Ex. 5, pp. 114-15, 120-21 (admitting that he should have taken different actions in response to Dr. Squier's instructions)).  The problem for PA Buskirk, however, is that Dr. Squier specifically testified that he did *not* tell her during their August 2011 conversation that Hodges' tumor was malignant.  (Doc. #51 at Ex. 6, pp. 34, 41-42).  Indeed, she testified that the first time she had any indication the tumor was malignant was October 12, 2011.  (*Id.* at Ex. 6, p. 45; *cf. supra*, fn. 5).  If Dr. Squier's testimony is credited, then, coupled with the clear direction in Dr. Haverbush's notes – in which he stressed the seriousness of Hodges' "malignant" cancer and "insisted" that Hodges see a radiation oncologist "at the earliest possible time" – one could conclude that PA Buskirk acted with deliberate indifference in failing to convey this obviously critical information[7] to Dr. Squier.

---

[7] This point highlights the real crux of this case – the potential life-and-death nature of the

With respect to Dr. Berhane, who first saw Hodges on September 9, 2011, the Corizon Defendants argue that she was not deliberately indifferent and, indeed, "continually moved [Hodges'] treatment forward" and succeeded in submitting "an ultimately successful consultation request for radiation oncology less than six weeks after Mr. Hodges' arrival [at LMF]."  (Doc. #46 at 35).  It is true that Dr. Berhane saw Hodges only a few times.  It is also true that when a September 21, 2011 x-ray showed that Hodges' wrist was worsening, Dr. Berhane sent an e-mail to Dr. Bomber (on September 27, 2011) saying she would "like to push for radiation."  (Doc. #46 at Ex. H, pp. 4-5).  The Corizon Defendants assert that it was a "consensus" decision (not Dr. Berhane's, apparently) to send Hodges for a second opinion from an orthopedist (Dr. Ganzhorn) – rather than straight to a radiation oncologist – and that such a decision does not evidence deliberate indifference on her part.  (*Id.* at 24).

While Dr. Berhane's actions might be viewed as less culpable than those of the other named defendants, Hodges nevertheless has come forward with sufficient evidence to create a genuine issue of material fact as to whether she was deliberately indifferent to his serious medical needs by failing to timely send him to see a radiation oncologist.  As noted above, Dr. Berhane received an email from Dr. Bomber on September 8, 2011 – before Hodges even arrived at LMF – notifying her that he had been contacted by Dr. Haverbush, who had "resected a malignant giant cell tumor" from Hodges' wrist and that Hodges needed to be seen "ASAP." (*Id.* at Ex. H, p. 3).  The e-mail instructed her to "review the EMR, paper charts, Consultations, etc…."  (*Id.*).  Dr. Berhane admitted that it was very unusual to receive an e-mail about a

---

diagnosis described in Dr. Haverbush's note, and his highly unusual and urgent instructions imploring those in charge of Hodges' care to have him see a radiation oncologist immediately. While a jury could find the failure to share this information with Dr. Squier to be mere negligence, it also could find that such a failure constituted a "reckless disregard" of a risk of serious harm to Hodges.  *Broyles,* 478 F. App'x at 975; *Comstock,* 273 F.3d at 703.

particular incoming inmate and to see him within twenty-four hours of his arrival at the facility. (Doc. #51 at Ex. 7, p. 113). Moreover, each time Dr. Berhane saw Hodges, his condition was worsening. (Doc. #46 at Ex. C, pp. 100-02 ("mild swelling" and complaining of "severe pain" on September 9, 2011), pp. 103-06 ("small 0.5mm nodule present" on September 15, 2011), p. 107 (September 21, 2011 x-ray showed "Severe destruction of the pisiform and triquetrum …"), pp. 108-10 (Hodges reported feeling "a mass, and swelling of hand progressively getting worse" on September 27, 2011), pp. 111-14 (hand "swollen increasingly" and "in a lot of pain" on September 29, 2011), pp. 115-17 ("small knot spindle shaped appears to be [slightly] larger" on October 6, 2011). Thus, given what Dr. Berhane knew about Hodges' condition upon his arrival, the prior instructions for him to see a radiation oncologist "ASAP," and what she observed each time she saw him, there remains a genuine issue of material fact as to whether she was deliberately indifferent in failing to timely send Hodges to see a radiation oncologist. *See also, supra* fn. 6.

Finally, Dr. Squier argues that she was not deliberately indifferent in failing to immediately refer Hodges to a radiation oncologist, because she "agreed that a radiation oncology consult would be appropriate if the tumor demonstrated growth, or if there was bone deterioration, as that would be an indication for radiation treatment for this condition." (Doc. #46 at 37). The Corizon Defendants cite to Dr. Squier's reliance on an "Up to Date" article suggesting that Hodges' diagnosis was "not necessarily considered … malignant." (*Id.* at 38). Thus, they argue that Dr. Squier did not disregard Hodges' medical needs; rather, she implemented an appropriate treatment plan, based on medical literature, "rather than potentially subjecting Mr. Hodges to radiation," which may not have been necessary. (*Id.* at 38-39).

In response, Hodges points to PA Buskirk's testimony that, upon receipt of Dr.

17

Haverbush's notes in mid-to-late August 2011, he specifically told Dr. Squier that Hodges' tumor was malignant, and that Dr. Haverbush was insisting that Hodges be seen by a radiation oncologist "at the earliest possible time." (Doc. #51 at Ex. 5, pp. 22-26, 70). Although Dr. Squier denies this, claiming she was not aware that the tumor was malignant until October 12, 2011 (*Id.* at Ex. 6, p. 45), viewing this factual dispute in the light most favorable to Hodges, Dr. Squier was at least arguably deliberately indifferent in ignoring Dr. Haverbush's directive, and choosing instead to merely monitor a malignant tumor with periodic x-rays. *See e.g., LeMarbe v. Wisneski*, 266 F.3d 429, 438 (6th Cir. 2001) (denying summary judgment to doctor who became aware during surgery that the inmate faced a substantial risk of serious harm from a bile leak in his abdomen, but ignored that risk by merely closing the exterior incision and "fail[ing] to refer [the inmate] *immediately* to a specialist who could stop the leak…") (emphasis in original).

The Court is well aware of the body of cases which generally holds that one physician does not act with deliberate indifference simply because her assessment of an inmate's medical needs differs from another physician's assessment. But the law is also clear that notwithstanding that general rule, there is a point at which a doctor's prescribed treatment is so inappropriate under the circumstances that it recklessly disregards the risk to the inmate's health, and therefore constitutes deliberate indifference. *See Greeno v. Daley*, 414 F.3d 645, 654 (7th Cir. 2005) ("the defendants' contention that Greeno's claim fails because he received *some* treatment overlooks the possibility that the treatment Greeno did receive was 'so blatantly inappropriate as to evidence intentional mistreatment likely to seriously aggravate' his condition"); *Broyles,* 478 F. App'x at 975; *Comstock*, 273 F.3d at 703. *See also, supra* fn. 7. Taking the facts in the light most favorable to Hodges, a jury could find that threshold to have been crossed here.

Several analogous cases support the Court's conclusion that, by specifically disregarding

Dr. Haverbush's urgent demand that Hodges see a radiation oncologist "at the earliest possible time" to treat his "malignant" tumor, Dr. Squier was deliberately indifferent to a serious medical need.  For example, in *Gil v. Reed*, 381 F.3d 649 (7th Cir. 2004), the plaintiff alleged, in relevant part, that the prison physician, Dr. Reed, was deliberately indifferent when he failed to adhere to treatment recommendations imposed by an outside physician.  In that case, the plaintiff returned from the hospital following surgery for rectal prolapse, and the surgeon (Dr. Kim) sent "explicit instructions" to take a certain regimen of laxatives (Colace, Milk of Magnesia, and Metamucil) and <u>not</u> to take Tylenol 3 because of its constipating effects.  Dr. Kim instead prescribed Vicodin for pain, which was not part of the Bureau of Prisons' national formulary.  Dr. Reed cancelled the Milk of Magnesia and Metamucil and substituted Tylenol 3 for Vicodin, even after the plaintiff reiterated Dr. Kim's warnings.  The plaintiff was then severely constipated for more than a week following surgery, suffering pain, rectal bleeding, and an inability to urinate.  The defendants argued that Dr. Reed was not deliberately indifferent in making the decisions regarding these medications – that Dr. Reed's actions were "the result of a difference of medical opinion or at worst medical malpractice."  *Id.* at 663.  The court found that summary judgment in favor of Dr. Reed was inappropriate, however, saying that while he might be able to show at trial that his decisions were "simply an exercise of medical judgment rather than deliberate indifference," the fact that he explicitly disregarded the specialist's instructions created a genuine issue of material fact as to deliberate indifference.  *Id.* at 664.

Similarly, in *Rhinehart v. Scutt*, 2014 WL 5361936, at *20-21 (E.D. Mich. June 20, 2014), the plaintiff alleged that one of the defendants, Dr. Edelman, was deliberately indifferent in failing to approve him for expedited treatment for a mass on his liver.  In that case, the plaintiff alleged that another physician discussed with Dr. Edelman the need for the plaintiff to

be transferred to a different facility "for expedited followup regarding [his] liver mass," but Dr. Edelman "did not ensure that plaintiff was seen by a specialist until nine months later, when he was rushed to the emergency room." *Id.* at *20. The plaintiff further alleged that his treating specialist at Allegiance Hospital recommended that he be "transferred to a tertiary care institution for a TIPS procedure, and that the failure to do this procedure would increase [the plaintiff's] risk of serious harm, including death"; nevertheless, Dr. Edelman refused to approve the procedure. *Id.* The *Rhinehart* court refused to dismiss the plaintiff's deliberate indifference claim, noting that "'[E]vidence that a prison doctor ignored an outside specialist's instructions for a prison inmate is sufficient to survive a motion for summary judgment on a deliberate indifference claim.'" *Id.* (quoting *Weeks v. Hodges*, 871 F. Supp. 2d 811, 821 (N.D. Ind. 2012)).

Additionally, in *Jones v. Simek*, 193 F.3d 485 (7th Cir. 1999), the plaintiff suffered from arm pain and was eventually referred to a specialist. The specialist prescribed a sling, medication, and a consultation with an anesthesiologist. The prison doctor ignored the specialist's advice for many months until another specialist performed a nerve block on the inmate. In the meantime, the inmate lost the use of his right arm from the elbow down and suffered great pain. The court held that the refusal to follow the specialist's advice, if proven, met the standard for deliberate indifference and, thus, merited denial of summary judgment. *Id.* at 491. *See also Perez v. Fenoglio*, 792 F.3d 768 (7th Cir. 2015) (plaintiff stated a claim for deliberate indifference where he alleged that prison doctor ignored the treatment recommendations of outside specialists).

In summary, then, while a mere difference of opinion between one physician and another might not necessarily constitute "deliberate indifference," viewing the facts in the light most favorable to Hodges – including that Dr. Squier: knew in August 2011 that Hodges was suffering

from a rare *malignant* condition; knew that Dr. Haverbush was "*insisting*" that he see a radiation oncologist *immediately*; ignored this directive, instead simply electing to "monitor" Hodges for bone deterioration or tumor growth with periodic x-rays; and finally, sent Hodges for a second opinion from an orthopedic surgeon even after a September 21, 2011 x-ray showed that Hodges' wrist was worsening – he has raised a material question of fact as to whether Dr. Squier's conduct rose to "deliberate indifference." *See, e.g, Gulley v. Ghosh*, 864 F. Supp. 2d 725, 729 (N.D. Ill. 2012) ("Even after a prison medical official has provided treatment, a prisoner has a claim for deliberate indifference if the official continues the prisoner on a course of treatment known to be ineffective."); *see also Rhinehart*, 2014 WL 5361936, at *20-21; *Greeno*, 414 F.3d at 654.

### 3.   *The Corizon Defendants' Proximate Cause Argument*

The Corizon Defendants also argue that where, as here, a plaintiff is alleging an unreasonable delay in medical treatment, he must have "corroborative medical evidence in the record to demonstrate the detrimental effect of the delay in medical treatment." (Doc. #46 at 45 (citing *Napier v. Madison County, Ky.*, 238 F.3d 739, 742-43 (6th Cir. 2001)). The Corizon Defendants claim there is no way to know when Hodges' cancer spread (i.e., whether it metastasized to his lungs during the period of time when his referral to a radiation oncologist was delayed). In support of this argument, they rely on the report of their expert witness, Dr. Shah, who indicated that, "To a reasonable degree of medical certainty, it is unlikely the outcome of his rare malignancy would have been changed by being evaluated sooner by radiation or medical oncology…." (*Id.* (citing Doc. #46 at Ex. M, pp. 6-7)).

In response, Hodges cites evidence in the record suggesting that but for the delay in treatment, he would have had a better result. First, Hodges points to Dr. Ganzhorn's October 17,

2011 treatment record, in which he notes that, "Following surgery, it was recommended he undergo radiation therapy[]"and then states:  "Unfortunately, this patient never underwent radiation therapy and the cancer has now spread in the hand.  He now has significant destruction of the triquetrum, pisiform, and the lunate bone."  (Doc. #51 at Ex. 15).  According to Hodges, then, this note suggests that Dr. Ganzhorn believed that the cancer spread *because* he did not undergo radiation therapy, as recommended.  Hodges also relies on Dr. Watson's March 21, 2012 note, which states:

> Mr. Hodges presents with a very difficult situation with a very bulky sarcoma of the right wrist causing significant pain.  He does have pulmonary metastases and therefore has incurable malignancy.  **I do recommend radiation therapy to the right wrist in hopes of relieving or significantly decreasing the pain.  In addition, a goal of the radiation therapy would be to hopefully prevent the patient from needing an amputation of the distal right arm.**  I did discuss with Mr. Hodges that the radiation therapy is palliative and that since he has pulmonary metastases, his malignancy is incurable ….

(*Id.* at Ex. 8, p. A000003 (emphasis added)).  Hodges argues, then, that this note suggests that he may not have had to have his arm amputated and/or his cancer may not have metastasized if radiation had been provided immediately.  (*Id.* at 24).

In response, the Corizon Defendants argue that Hodges has no supporting affidavit or deposition testimony from Dr. Ganzhorn evidencing such an opinion; indeed, Dr. Ganzhorn executed an affidavit (attached to the Corizon Defendants' reply brief) saying that he did *not* form an opinion one way or the other regarding whether Hodges' cancer metastasized prior to October 17, 2011.  (Doc. #55 at Ex. B).  Thus, the Corizon Defendants argue that, if called to testify (as a treating physician, since Hodges has identified no retained expert witnesses[8]), Dr.

---

[8] As Defendants point out and counsel conceded at oral argument, Hodges did not serve any expert disclosures or reports in accordance with Fed. R. Civ. P. 26(a)(2)(A) and (B).  As a result, Fed. R. Civ. P. 37(c)(1) prohibits Hodges from calling an expert witness to whom those Rules apply to testify in support of his claims.

Ganzhorn would merely opine that Hodges needed to see an oncologist and then a hand surgeon (not that his cancer had metastasized at that point). (*Id.* at 3). Similarly, the Corizon Defendants point out that Dr. Watson's note states only that Hodges' cancer had metastasized by January 2012; Defendants claim there is no indication that Dr. Watson formed an opinion that the cancer metastasized *between August 29, 2011 and October 27, 2011*. (Doc. #55 at 4).

The Corizon Defendants' arguments on this issue are compelling, and it is indeed possible, as they assert, for the fact-finder to conclude that "the cancer could have metastasized <u>before</u> August 2011 or even <u>after</u> October 2011." (Doc. #55 at 4 (emphasis in original)). Nevertheless, viewing the facts in the light most favorable to Hodges, as the Court must do at this juncture, he has created a genuine issue of material fact that the delay in referring him to a radiation oncologist had a detrimental effect on his condition. Dr. Haverbush believed it was imperative that Hodges see a radiation oncologist immediately. Although Dr. Ganzhorn stated in his affidavit that he has no opinion as to whether Hodges' cancer spread locally after August 29, 2011, or metastasized prior to October 17, 2011, his contemporaneous treatment note could certainly be construed as opining that Hodges' cancer spread because he did not timely undergo radiation therapy, and Hodges should be permitted to present this apparent inconsistency to a jury.[9] Similarly, since Dr. Watson's note indicates that one of the goals of the suggested radiation treatment was to "hopefully prevent [Hodges] from needing an amputation…," a reasonable inference (in the light most favorable to Hodges) is that a timely referral to a radiation oncologist may have allowed Hodges to save his arm. Moreover, when Dr. Biermann saw

---

[9] When construed in the light most favorable to Hodges, Ganzhorn's note could reasonably be interpreted as suggesting both a temporal ("[Hodges] *never underwent* radiation therapy and the cancer has *now* spread…He *now* has significant destruction of the triquetrum…") and causal ("*Unfortunately* …") connection between the failure to timely provide radiation therapy to Hodges and the spreading of his cancer. (Doc. #51 at Ex. 15).

Hodges on December 21, 2011, she specifically noted: "obviously this tumor has recurred and grown" since the time of the July 2011 pathology report. (Doc. #51 at Ex. 9). All of this evidence, taken together, creates a genuine issue of material fact as to whether the Corizon Defendants' delay in referring Hodges to a radiation oncologist detrimentally affected his medical condition. As such, summary judgment should be denied.

## III. CONCLUSION

For the reasons set forth above, **IT IS RECOMMENDED** that the Corizon Defendants' Motion for Summary Judgment (**Doc. #46**) be **GRANTED IN PART**, with respect to Hodges' gross negligence claim (Count II), and **DENIED IN PART**, with respect Hodges' deliberate indifference claim (Count I).

Dated: June 22, 2016                s/David R. Grand
Ann Arbor, Michigan            DAVID R. GRAND
                                  United States Magistrate Judge

## NOTICE TO THE PARTIES REGARDING OBJECTIONS

Within 14 days after being served with a copy of this Report and Recommendation and Order, any party may serve and file specific written objections to the proposed findings and recommendations and the order set forth above. *See* 28 U.S.C. §636(b)(1); Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d)(1). Failure to timely file objections constitutes a waiver of any further right of appeal. *See Thomas v. Arn*, 474 U.S. 140, (1985); *United States v. Sullivan,* 431 F.3d 976, 984 (6th Cir. 2005). Only specific objections to this Report and Recommendation will be preserved for the Court's appellate review; raising some objections but not others will not preserve all objections a party may have. *See Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987); *see also Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596-97 (6th

Cir. 2006).  Copies of any objections must be served upon the Magistrate Judge.  *See* E.D. Mich.

LR 72.1(d)(2).

A party may respond to another party's objections within 14 days after being served with

a copy.  *See* Fed. R. Civ. P. 72(b)(2); 28 U.S.C. §636(b)(1).  Any such response should be

concise, and should address specifically, and in the same order raised, each issue presented in the

objections.

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record
and any unrepresented parties via the Court's ECF System to their respective email or First Class
U.S. mail addresses disclosed on the Notice of Electronic Filing on June 22, 2016.

s/Eddrey O. Butts
EDDREY O. BUTTS
Case Manager